
CASE UNSEALED
1/21/14


FILED
JAN 21 2014
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>RAVNEET SINGH (1),<br>ELECTIONMALL, INC. (2),<br>ERNESTO ENCINAS (3),<br><br>　　　　　　Defendants. | Case No.: **'14MJ0201**<br><br>COMPLAINT<br><br>Title 18, U.S.C., Sec. 371 - Conspiracy to Commit Offenses Against the United States |

The undersigned complainant, being duly sworn, states:

Beginning in or about a date unknown, but no later than 2011, and continuing through in or about December 2013, in the Southern District of California and elsewhere, Defendants RAVNEET SINGH, ELECTIONMALL, INC., and ERNESTO ENCINAS conspired together and with others to:

(1) Knowingly and willfully make foreign national contributions and expenditures, aggregating $25,000

and more during a calendar year in violation of Title 2, United States Code, Sections 437g(d)(1)(A)(i) and 441e;

(2) Knowingly and willfully make contributions to a candidate for federal office in the names of other persons, aggregating $25,000 and more during a calendar year in violation of Title 2, United States Code, Sections 437g(d)(1)(A)(i) and 441f; and

(3) to falsify a record in a matter within the jurisdiction of the Federal Bureau of Investigation in violation of Title 18, United States Code, Section 1519;

all in violation of Title 18, United States Code, Section 371.

And the complainant further states that the foregoing is based on the attached statement of facts, which is incorporated herein by reference.

_____
ERIN C. PHAN
Special Agent, FBI

SWORN TO ME AND SUBSCRIBED IN MY PRESENCE, THIS 17th DAY OF January, 2014.

_____
HON. WILLIAM McCURINE, JR.
U.S. MAGISTRATE JUDGE

**STATEMENT OF PROBABLE CAUSE**

Individuals Involved

According to witness statements, reports and open source records, a person hereinafter referred to as "the Foreign National" is a wealthy businessman with residences in California. Immigration records indicate that the Foreign National is a citizen of Mexico, and not a citizen of the United States. Nor has the Foreign National ever applied for, or obtained, legal permanent resident status in the United States. As a consequence, the Foreign National is a "foreign national" for the purposes of Title 2 of the United States Code. As a foreign national, the Foreign National cannot lawfully make donations, contributions or expenditures, directly or indirectly, in connection with any local, state or federal election.

Public and open source records show that RAVNEET SINGH ("SINGH") is the President, Chief Executive Officer and founder of ElectionMall, Inc. ("ELECTIONMALL"). According to its website, ELECTIONMALL specializes in providing social media services to political campaigns throughout the world. SINGH, who styles himself the "campaign guru," works principally out of offices in Washington, D.C., and has

4

helped the Foreign National make campaign contributions to candidates for elective office in San Diego.

According to witnesses and open source records, ERNESTO ENCINAS ("ENCINAS") is a retired San Diego Police Department ("SDPD") detective and the owner of a private security and consulting business. ENCINAS also oversees the Foreign National's protection detail - and has helped the Foreign National make contributions to, and seek favors from, candidates and office holders in San Diego.

According to witnesses and open source records, a person hereinafter referred to as "the Straw Donor" is the owner of a California company. The Straw Donor is a friend of the Foreign National, and has assisted the Foreign National in making campaign contributions to candidates for elective office in San Diego.

ENCINAS and the Foreign National Learn of the Prohibition against Foreign National Contributions

Witnesses indicate that in or about 2011, the Foreign National became interested in influencing San Diego electoral politics. On the Foreign National's behalf, ENCINAS inquired with the representative of certain political campaigns, who informed him that foreign nationals

5

cannot donate to political campaigns in the United States. ENCINAS reported this to the Foreign National.

### Illegal Campaign Expenditures: Candidate 1

In or about May 2012, the Foreign National and ENCINAS agreed to create, and did cause to be created, an independent expenditure committee. Sometimes called a "PAC," "SuperPAC" or "IE," such a committee can be used to pay for certain types of political advertising.

Public records show that ENCINAS invested $3,000 in this committee, and the Foreign National invested a total of $100,000. However, the Foreign National did not directly fund the committee, but instead funneled his $100,000 through a United States-based shell corporation. The consequence of this, as ENCINAS and others knew, was that the Foreign National would not be identified on the committee's public filings. In this way, the Foreign National, ENCINAS and others could facilitate a series of illegal expenditures by a foreign national while impeding any investigation into the true source of those funds.

Ultimately, this committee made approximately $114,000 in expenditures in favor of Candidate 1, a candidate for the office of mayor of San Diego during the 2012 primary

election cycle. For example, according to public filings, between May 20 and 31, 2012, the committee spent approximately $86,000 on mailers and related services. As a result of these actions, the committee failed to disclose in public filings that the Foreign National was its major source of financing.

According to email records, in or about February 2012, the Foreign National agreed to pay SINGH and ELECTIONMALL approximately $100,000 for social media services that would help Candidate 1 - over and above the cash he had already contributed to the independent expenditure committee. According to invoices obtained from the Foreign National's email account, the Foreign National specifically agreed to purchase from SINGH and ELECTIONMALL display ads, banner ads, text ads and key ad word placements from Google, Inc. According to email and bank records, the Foreign National funded these campaign-related purchases by directing wire transfers from a Mexico-based company to ELECTIONMALL's bank account. As agreed between SINGH, ENCINAS and others, at no time did any entity report this campaign-related spending in a public filing. As a consequence, SINGH, ENCINAS and others successfully concealed the fact that the Foreign

National was the source of this significant, and illegal, campaign financing.

After the Foreign National used the PAC to make illegal expenditures in favor of Candidate 1, a local news source published an article noting the Foreign National's large expenditures and implicitly questioning whether he was eligible to donate. The article noted that the Foreign National was a Mexican citizen, and quoted a political consultant stating, incorrectly, that the Foreign National had a "green card."

### Illegal Campaign Contributions: Candidate 2

Witnesses further indicate that in or about September 2012, at the Foreign National's behest, ENCINAS approached a representative of Candidate 2, who was a candidate for federal elective office during the 2012 general election cycle. ENCINAS offered to arrange campaign financing in connection with Candidate 2's campaign, but was informed that the Foreign National would have to show proof of a "green card" before he could legally contribute, and that he could not donate through a corporation. Knowing that the Foreign National did not have legal permanent resident status, and thus lacked a "green card," ENCINAS helped the

Foreign National contribute in the Straw Donor's name instead.

Shortly thereafter, bank records show that in or about September and October 2012, the Foreign National gave money to the Straw Donor, including through a $380,000 check dated October 2, 2012. The Straw Donor deposited this check into a bank account associated with one of his corporations, and then proceeded to divide the Foreign National's money among other bank accounts that he (the Straw Donor) controlled. While the various checks cleared, the Straw Donor wrote a $30,000 check to a political party committee associated with Candidate 2's campaign. In doing so, ENCINAS and others – in conjunction with the Straw Donor and the Foreign National – illegally facilitated a conduit contribution in connection with a federal campaign. In addition, they furnished illegal campaign financing while hiding the fact that the Foreign National was the true source of the funds.

Illegal Contributions and Expenditures: Candidate 3

In or about October 2012, SINGH, ENCINAS and others approached a representative of Candidate 3, who was a candidate for the office of mayor of San Diego in the 2012 general election cycle. Together, SINGH, ENCINAS and others

proposed to this representative (herein referred to as Confidential Informant #1 ("CI-1")) that they could arrange for certain social media spending on behalf of Candidate 3's campaign. CI-1 asked for a price quote for this social media spending, but SINGH and ENCINAS demurred, telling him/her the expenses would be "taken care of." CI-1 then agreed to this spending, even though s/he knew it would not be reported on any public filings, in contravention of the law. (Since that time, CI-1 has spoken to agents about this incident after requesting, and receiving, an informal grant of immunity.)

During approximately the same period that this conversation between SINGH, ENCINAS and CI-1 took place, in or about October 2012, bank records reveal that the Foreign National's Mexico-based company transmitted a total of approximately $190,000 to ELECTIONMALL. Despite this, the Foreign National and his coconspirators never provided an invoice or other statement of costs to Candidate 3's campaign. In addition, at no time did any entity report this campaign-related spending in a public filing. In this way, SINGH, ELECTIONMALL, ENCINAS and others facilitated illegal in-kind contributions by a foreign national to

Candidate 3's campaign while impeding any investigation into the true source of the funds.

Meanwhile, according to bank records, also in or about October 2012, using money that the Foreign National had given him, the Straw Donor wrote a $120,000 check from one of his corporation's bank accounts to an independent expenditure committee that favored Candidate 3. Shortly thereafter, a representative of the independent expenditure committee emailed ENCINAS and another person to thank them for the check. Around the same time, using money that the Foreign National had given him, the Straw Donor wrote yet another $30,000 check from one of his corporation's bank accounts, this time to a political party committee associated with Candidate 3's campaign.

### Proposed Illegal Campaign Financing: Candidate 4

According to an intercepted telephone call, on or about August 1, 2013, ENCINAS called CI-1 on his/her cell phone and asked whether Candidate 4 would consider running for the office of mayor of San Diego in the event that the then-Mayor of San Diego resigned or was recalled from office. In addition, ENCINAS asked whether Candidate 4 might be interested in "foreign investment" to his campaign. CI-1,

11

who had not yet been contacted by the FBI and was not yet a confidential informant, replied that campaign financing for Candidate 4 "has got to be clean, you know," further elaborating that "shit still hasn't come out from the last election, whether it's clean or not . . . and ethics probes . . . and the FPPC violations and everything, so . . . [Candidate 4]'s going to be squeaky clean."

Eventually, the Mayor of San Diego resigned his office, triggering a special election to replace him. Shortly thereafter, Candidate 4 became a candidate for the office of mayor in the 2013 special election cycle.

On or about August 28, 2013, CI-1 met ENCINAS and another person at a downtown hotel to discuss how the Foreign National might help finance Candidate 4's mayoral campaign. This meeting was the product of a ruse, and Candidate 4 had no knowledge of it taking place. During the meeting – which was audio- and video-recorded – CI-1 asked ENCINAS to confirm that the Foreign National was Mexican, which he and his associate did. CI-1 then asked how SINGH received payment for his services to Candidate 3. Laughing, ENCINAS said "I think a third party."

//

On or about September 10, 2013, CI-1 and ENCINAS met at a coffee shop to continue to discuss financing for Candidate 4's mayoral campaign. This meeting was also the product of a ruse, and Candidate 4 had no knowledge of it taking place. During their discussion, which was audio- and video-recorded, ENCINAS explained that - just as he had done in the past - he could create a series of companies or committees for the purpose of hiding the ultimate source of the campaign financing. According to ENCINAS, this would create "walls" between the Foreign National and Candidate 4, thus "layer[ing] out" the entities through which money was "funneled" so that "it can be hidden away pretty good."

On or about September 18, 2013, ENCINAS contacted a person involved in campaign finance (hereinafter referred to as "CI-2"), and asked to meet with him/her. That same day, ENCINAS and CI-2 met at a coffee shop. During the meeting, which was audio- and video-recorded, CI-2 informed ENCINAS that the Foreign National could not give to Candidate 1 in the future because the Foreign National did not have a green card. Acting at my direction, CI-2 then asked whether ENCINAS could think of a way for the Foreign National to contribute that was "not sort of traceable." ENCINAS

13

replied, in substance, that the Foreign National could funnel money through the Straw Donor.

### ENCINAS's Request to Fire the Chief of Police and Choose his Replacement

Immediately after meeting with CI-2, on September 18, 2013, ENCINAS met with CI-1. During this meeting, ENCINAS and CI-1 continued to discuss how ENCINAS could facilitate campaign financing for Candidate 4 while concealing the funds' true source. In addition, ENCINAS related that he wanted the next mayor to fire the Chief of Police and replace him with a person of ENCINAS's choosing. ENCINAS further stated that this was the one "guarantee" he sought from Candidate 4 in exchange for the Foreign National's campaign money.

### FBI Jurisdiction and Investigation

It is a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI") to investigate potential illegal campaign donations, contributions and expenditures at the federal, state and local level. It is also a matter within the jurisdiction of the FBI to investigate the potential influence of foreign money in American elections, including the donations, contributions and expenditures of

foreign nationals. It is furthermore a matter within the jurisdiction of the FBI to investigate bribery of public officials, including bribery schemes characterized as the deprivation of honest services.

Presently, the FBI is investigating the Foreign National, SINGH, ELECTIONMALL, ENCINAS, the Straw Donor and others with respect to, among other things, possible illegal campaign contributions and expenditures, as well as potential conspiracies to deprive the public of honest services through the improper influence of San Diego City officials.